# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

SHIRLEY CHARLEBOIS-DEUBLER,

        Plaintiff,

v.                                                    Case No:  6:11-cv-1307-Orl-37GJK

PRUDENTIAL INSURANCE
COMPANY OF AMERICA,

        Defendant.

_____

## REPORT AND RECOMMENDATION

This cause came on for consideration, without oral argument, on the following motions:

| MOTION: | PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 25) |
|---|---|
| FILED: | July 2, 2012 |
| | |
| **THEREON** it is **RECOMMENDED** that the motion be **DENIED**. | |

| MOTION: | PRUDENTIAL'S RESPONSE IN OPPOSITION TO PLAINTIFF'S SUMMARY JUDGMENT MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT (Doc. No. 34) |
|---|---|
| FILED: | August 17, 2012 |
| | |
| **THEREON** it is **RECOMMENDED** that the motion be **GRANTED**. | |

## I.  BACKGROUND

On August 8, 2011, Plaintiff, Shirley Charlebois-Deubler, filed a Complaint against Defendant, The Prudential Insurance Company of America, pursuant to the Employee Retirement Income Security Act (hereafter "ERISA"), 29 U.S.C. § 1001 et. seq.  Doc. No. 1. Plaintiff asserts one claim, pursuant to 29 U.S.C. § 1132(a)(1)(B), alleging that she is entitled to benefits under an accidental death and dismemberment policy (hereafter "ADD Policy") purchased through her employment with Tupperware Corporation (hereafter "Tupperware"). Doc. No. 1 at 3.  On September 2, 2011, Defendant filed its answer and affirmative defenses. Doc. No. 6.  On July 2, 2012, Plaintiff filed her motion for summary judgment (hereafter "Plaintiff's Motion").  Doc. No. 25.  Accompanying Plaintiff's Motion is the ADD Policy claim file and plan documents (Doc. No. 30), which the parties stipulate "represent the Administrative Record and Plan Documents applicable in this matter" (hereafter "Administrative Record"). Doc. No. 30-1.  On August 17, 2012, Defendant filed its response and cross motion for summary judgment (hereafter "Defendant's Motion").  Doc. No. 34.  On August 31, 2012, Plaintiff filed her response to Defendant's Motion.  Doc. No. 35.  On September 13, 2012, Defendant filed its reply brief.  Doc. No. 36.

### A.  Undisputed Facts re: ADD Policy and Claims History

The following facts, as taken from the Complaint, answer, and Administrative Record, are undisputed.  Plaintiff was employed by Tupperware when she purchased a $500,000 ADD Policy that included her husband, Michael A. Charlebois, as an insured spouse.  Doc. Nos. 1 at 1-2 ¶¶ 4-5; 6 at 1-2 ¶ 4; 30-5 at 96-97.  Plaintiff was the beneficiary on the ADD Policy.  Doc. Nos. 1 at 1 ¶ 4; 6 at 2 ¶ 4.  The ADD Policy is a welfare benefit plan that was established under ERISA and Tupperware is the sponsor and administrator of the plan.  Doc. Nos. 1 at 2 ¶¶ 6-7; 6

at 2 ¶¶ 6-7.  Defendant is the claims administrator, makes a full and fair final review of all claims and ensures payment of benefits.  Doc. Nos. 1 at 2 ¶ 9; 6 at 2 ¶ 9.  A copy of the coverage booklet and certificate of coverage are attached to the Complaint.  Doc. Nos. 1 at 2 ¶ 8; 1-1; 1-2; 6 at 2 ¶¶ 8.

On August 26, 2007, Mr. Charlebois was involved in a motorcycle accident wherein he suffered bilateral frontoparietal and temporal contusions, subarachnoid hemorrhage/right parietal skull fracture, acute respiratory failure and a severance of his right pinkie finger.  Doc. No. 1 at 2 ¶ 10; 6 at 2 ¶ 10; Doc. No. 30-3 at 84.  On June 22, 2009, Mr. Charlebois died.  Doc. No. 1 at 2 ¶ 10; 6 at 2 ¶ 10.  Mr. Charlebois' death certificate listed the cause of death as "[d]elayed complications of blunt head trauma," suffered as a result of the motorcycle accident.  Doc. No. 30-5 at 31.  On July 9, 2009, Plaintiff submitted a claim for accidental death benefits under the ADD Policy.  Doc. No. 30-6 at 60-63.  On September 17, 2009, Defendant denied the claim.  Doc. No. 30-6 at 87-89.[1]  On November 6, 2009, Plaintiff submitted a new claim for accidental dismemberment benefits, asserting that Mr. Charlebois lost the ability to speak and became paraplegic as he could not walk within a year of the accident.  Doc. No. 30-4 at 4.[2]  Plaintiff also attached a letter from Charles K. Powers, M.D., dated October 16, 2009, wherein Dr. Powers stated that Mr. Charlebois "had partial hemiplegia as evidenced by hand muscle wasting and inability to ambulate," referencing his January 9, 2008, treatment note, and permanently lost the ability to speak on November 30, 2007.  Doc. No. 30-4 at 5-6.

On November 19, 2009, Defendant sent a questionnaire to Jill C. Fallon, M.D., asking her to evaluate Plaintiff's claim that Mr. Charlebois suffered from paraplegia, partial hemiplegia

---

[1] Plaintiff is not challenging the Defendant's denial of her claim for accidental death benefits.

[2] In her November 6, 2009, letter, Plaintiff indicated she was appealing the denial of her claim for accidental death benefits, yet asserted that Mr. Charlebois suffered a loss of speech, paraplegia and hemiplegia.  Doc. No. 30-4 at 4. As a result, Defendant treated the letter as a new claim for accidental dismemberment benefits.  Doc. No. 30-6 at 71.

and total loss of speech.  Doc. No. 30-3 at 43-45.  Dr. Fallon reviewed Dr. Powers' medical records and submitted her responses on January 6, 2010.  Doc. No. 30-3 at 43-45.  Dr. Fallon opined that Mr. Charlebois did not suffer total and permanent speech loss or complete and irreversible paralysis of his limbs that would support a finding of paraplegia or hemiplegia.  Doc. No. 30-3 at 44-45.  On February 9, 2010, Defendant denied Plaintiff's claim for accidental dismemberment benefits.  Doc. No. 30-6 at 76-80.

On July 19, 2010, Plaintiff sent a letter appealing the denial of her claim for accidental dismemberment benefits based on Mr. Charlebois suffering from paraplegia within 365 days after his accident.  Doc. No. 30-3 at 18-21.  In this letter, Plaintiff noted that the ADD Policy's definition of loss included an accident resulting in paraplegia.  Doc. No. 30-3 at 19.  Plaintiff noted that the ADD Policy defined paraplegia as the complete and irreversible paralysis of both lower limbs, but did not define paralysis.  Doc. No. 30-3 at 19.  Plaintiff proffered four definitions of paralysis, noting that all of them included loss, impairment or loss of sensation as part of the definition.  Doc. No. 30-3 at 19-20.  Plaintiff pointed out that Dr. Fallon indicated that Mr. Charlebois suffered from progressive weakness and occasional numbness in his lower extremities after the accident.  Doc. No. 30-3 at 20.  Plaintiff argued that Mr. Charlebois' paralysis was complete when he lost sensation in and had impaired use of his legs following the accident.  Doc. No. 30-3 at 20.  Plaintiff further argued that the paralysis was irreversible and, therefore, benefits were payable under the ADD Policy.  Doc. No. 30-3 at 20.

On November 30, 2010, Defendant denied Plaintiff's appeal.  Doc. No. 30-6 at 68-72.  Defendant rejected Plaintiff's argument that progressive weakness and occasional numbness constituted complete paralysis.  Doc. No. 30-6 at 71.  Defendant also stated that the term paraplegia was not ambiguous.  Doc. No. 30-6 at 71.  As a result, Defendant concluded that Mr.

Charlebois did not suffer from paraplegia or hemiplegia within 365 days after the accident and, therefore, was not entitled to accidental dismemberment benefits under the ADD Policy.  Doc. No. 30-6 at 71.

On May 3, 2011, Plaintiff filed her second appeal of the denial of her claim for accidental dismemberment benefits, raising the same arguments as in her first appeal.  Doc. No. 30-3 at 1. On June 8, 2011, Defendant denied Plaintiff's second appeal for the same reasons expressed in its November 30, 2010, decision.  Doc. No. 30-7 at 129-133.

### B.  Undisputed Facts: Charles Powers, M.D., Medical Records

The Administrative Record contains treatment notes from Dr. Powers from November 30, 2007, through March 25, 2009.  In his November 30, 2007, treatment note, Dr. Powers noted Plaintiff's report that Mr. Charlebois "generally does not speak much at home, has some expressive aphasia, seems to prefer not to speak.  She says he might say 10-20 words in a day." Doc. No. 30-3 at 89.  Dr. Powers' physical examination indicated that Mr. Charlebois had a normal gait with no significant tremors.  Doc. No. 30-3 at 89.  On January 9, 2008, Dr. Powers noted that Mr. Charlebois answered questions most of the time and exhibited "obvious wasting interdigital musculature and thenar eminence, no focal pain to palpation over arms and legs." Doc. No. 30-3 at 88.

On May 21, 2008, Mr. Charlebois complained of ear pain, shoulder pain and memory impairment.  Doc. No. 30-3 at 77.  Mr. Charlebois reported that the shoulder pain was in his left shoulder, had been occurring in a persistent pattern for months and was aggravated by physical activity.  Doc. No. 30-3 at 77.  Dr. Powers' examination revealed that there was no tenderness to palpation, no instability, no subluxation, no laxity and Mr. Charlebois was able to abduct 70% with his left shoulder compared to 90% with his right shoulder.  Doc. No. 30-3 at 80.  On May

30, 2008, Dr. Powers met with Plaintiff to discuss Mr. Charlebois' "mental capacity concerning financial issues and his own safety."  Doc. No. 30-3 at 74.  Plaintiff reported that Mr. Charlebois "exercises twice per week (walks in yard)."  Doc. No. 30-3 at 74.[3]  On August 27, 2008, Plaintiff reported that Mr. Charlebois "is uncontrollable and verbally abusive."  Doc. No. 30-3 at 70.

On September 18, 2008, Plaintiff reported that Mr. Charlebois was "falling a lot."  Doc. No. 30-3 at 67.  It was also reported that Mr. Charlebois was experiencing leg pain that was precipitated by "exertion (pt tripped and fell after arising from sleep to use the restroom in the middle of the night. no head trauma or LOC.).  Aggravating factors include exertion."  Doc. No. 30-3 at 67.[4]  On November 14, 2008, Plaintiff reported that Mr. Charlebois "refuses to walk past 3 weeks and small amount of verbal communication."  Doc. No. 30-3 at 63.  Dr. Powers' physical examination indicated that Mr. Charlebois had difficulty speaking and weakness in his extremities.  Doc. No. 30-3 at 64.  The December 3, 2008, treatment note indicated that Mr. Charlebois was unable to stand without assistance and exhibited moderate wasting in his hands.  Doc. No. 30-3 at 61.  The March 25, 2009, treatment note indicated that Mr. Charlebois was no longer able to stand and was non-verbal.  Doc. No. 30-3 at 51.

## C.  ADD Policy

The ADD Policy is made up of two documents:  a group insurance certificate and a group contract.  Doc. No. 30-5 at 102.[5]  The group insurance certificate (hereafter "GIC") also consists

---

[3]  This treatment note also states that Mr. Charlebois' "[e]xercise level is none."  Doc. No. 30-3 at 74.

[4]  This treatment note was recorded by Karl Schweinberg.  Doc. No. 30-3 at 67.

[5]  The group contract has not been submitted as part of the record.  Plaintiff indicates that Defendant did not produce the group contract.  Doc. No. 25 at 11.  Defendant indicates that Plaintiff never requested a copy of the group contract and it was inadvertently omitted from the Administrative Record.  Doc. No. 34 at 2 n.1.  Defendant further indicates the group contract will not have a dispositive effect, but will be produced if requested by the Court.  Doc. No. 34 at 2 n.1.  In light of this concession and the parties' stipulation that the Administrative Record contains the applicable administrative records and plan documents, the Court sees no reason to have the group contract produced.

of two documents:  a booklet describing the available coverages for term life and accidental dismemberment and death (hereafter "Booklet"), and a certificate of coverage.  Doc. No. 30-5 at 102, 141.  The Booklet provides that a covered loss under the ADD Policy includes loss of life, total and permanent loss of speech and loss due to quadriplegia, paraplegia or hemiplegia.  Doc. No. 30-5 at 125.  Paraplegia is defined as the "complete and irreversible paralysis of both lower limbs."  Doc. No. 30-5 at 125.  Hemiplegia is defined as the "complete and irreversible paralysis of the upper and lower limbs on one side of the body."  Doc. No. 30-5 at 125.  A covered loss is only payable if it was sustained by a "Covered Person" and resulted directly from the accidental injury or death, which was suffered within 365 days of the accident.  Doc. No. 30-5 at 125.

## II.  STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Whether a fact is material depends on the substantive law of the case.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  The Court must consider all inferences drawn from the underlying facts in a light most favorable to the non-moving party, and resolve all reasonable doubts against the moving party.  *Id.* at 255.  If an issue of material fact exists, the Court must not decide it, but rather, must deny summary judgment and proceed to trial.  *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981).[6]  When no issue of material fact exists, the Court may enter judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Summary judgment is mandated against a party who "fails to make a showing sufficient to establish the existence of an element essential to that

---

[6] All decisions of the Fifth Circuit prior to October 1, 1981 are binding precedent on this Court.  *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III. ANALYSIS

The parties' motions for summary judgment raise two disputed issues. The first issue is whether Defendant's decision to deny Plaintiff's claim for accidental dismemberment benefits should be reviewed de novo or under an arbitrary and capricious standard. The second issue is the interpretation of "paralysis" in the ADD Policy.

Plaintiff argues that Defendant's decision is subject to de novo review and the ADD Policy is ambiguous because "'paralysis' includes not only the complete lack of use of the limb but also the impairment of the limb." Doc. No. 25 at 2, 16. Defendant argues that under a de novo standard of review, the ADD Policy clearly and unambiguously requires "complete and irreversible paralysis" before accidental dismemberment benefits may be paid. Doc. No. 34 at 10-13. Defendant asserts that Plaintiff attempts to manufacture ambiguity in an effort to avoid the ADD Policy's clear and unambiguous language. Doc. No. 34 at 11. Defendant further argues that its decision was not arbitrary and capricious because it was consistent with the plain terms of the ADD Policy and is "absolutely reasonable and consistent with a layman's understanding of paralysis." Doc. No. 34 at 19.

### A. ERISA Standard of Review

ERISA is a comprehensive system of federal regulations governing private employee benefit plans, including pension plans and welfare plans. *Dist. of Columbia v. Greater Washington Bd. of Trade*, 506 U.S. 125, 127 (1992). ERISA's scope is broad and exclusive by virtue of an express preemption provision. *See id.* However, it does not set forth the standard of

review for challenges to benefit eligibility determinations brought pursuant to Section 1132(A)(1)(B).  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989).

Notwithstanding ERISA's silence on the proper standard of review, the Supreme Court in *Firestone*, 489 U.S. at 115, directed that a "denial of benefits challenged under §1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  If the benefit plan expressly and unambiguously confers discretionary authority on the benefit plan's administrator, the denial of benefits is reviewed under an arbitrary and capricious standard.  *Hunt v. Hawthorne Assocs., Inc.*, 119 F.3d 888, 912 (11th Cir. 1997).  This standard requires the Court to "determine whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made."  *Jett v. Blue Cross & Blue Shield of Ala., Inc.*, 890 F.2d 1137, 1139 (11th Cir. 1989).

In determining whether the administrator's decision is arbitrary and capricious, the Court employs a multi-step analysis:

1. Apply a de novo standard and determine whether the administrator's decision is wrong (i.e. whether the Court disagrees with the decision).  If the decision is not wrong, then affirm the decision;

2. If the administrator's decision is de novo wrong, then determine whether the benefit plan conferred discretionary authority on the administrator.  If not, then reverse the decision;

3. If the administrator's decision is de novo wrong and the benefit plan conferred discretionary authority on the administrator, then determine whether the decision is supported using the arbitrary and capricious standard of review.  If the administrator's

decision is not supported under the arbitrary and capricious standard of review then reverse the decision; and

4. If the administrator's decision is supported using the arbitrary and capricious standard of review, then determine whether the administrator acted under a conflict of interest. If not, affirm the decision.

*Doyle v. Liberty Life Assurance Co. of Boston*, 542 F.3d 1352, 1356 (11th Cir. 2008).

The first step in addressing a plan administrator's decision to deny benefits is determining the standard of review: de novo or arbitrary and capricious. *Hunt*, 119 F.3d at 912. Although the parties in this case disagree which standard applies, both parties analyze the denial of Plaintiff's claim using *Doyle*'s multi-step analysis. Doc. Nos. 25 at 22-25; 34 at 10-20. Although there are Eleventh Circuit cases that suggest this multi-step analysis applies to all plan administrator decisions, independent of whether the plan grants discretionary authority, the Court agrees with *Hunley v. Hartford Life & Accident Insurance Co.*, 712 F. Supp. 2d 1271, 1280 (M.D. Fla. 2010), that applying the multi-step analysis in all cases conflicts with the Supreme Court's mandate in *Firestone* that a plan administrator's decision is reviewed de novo unless the plan grants the administrator discretion to determine benefit eligibility or construe the terms of the plan. *Id.* Thus, the Court will only utilize *Doyle*'s multi-step analysis if the ADD Policy granted Defendant discretion to determine Plaintiff's eligibility for benefits or construe the terms of the ADD Policy.

The parties' dispute concerning the applicable standard of review hinges upon a document that is attached to the Booklet (hereafter "Booklet Attachment"), which states: "The Prudential Insurance Company of America as Claims Administrator has the sole discretion to interpret the terms of the Group Contract, to make factual findings, and to determine eligibility

for benefits. The decision of the Claims Administrator shall not be overturned unless arbitrary and capricious." Doc. No. 30-5 at 144. The page appending the Booklet Attachment states: "The following information is not part of the Group Insurance Certificate. It has been provided by your Employer and included in your Booklet-Certificate upon the Employer's request." Doc. No. 30-5 at 142.

Plaintiff characterizes the Booklet Attachment as an "ERISA statement" and contends the page appending the Booklet Attachment makes clear that it is not part of the Booklet and, therefore, not part of the GIC. Doc. No. 25 at 12. Plaintiff cites *Roth v. Prudential Insurance Co. of America*, 752 F. Supp. 2d 1160, 1164 (D. Or. 2010), as a case where the court found an ERISA statement was not a plan document and could not grant the plan administrator discretion to interpret the plan documents. Doc. No. 25 at 12. Plaintiff also cites *Shaw v. Connecticut General Life Insurance Co.*, 353 F.3d 1276, 1282 (11th Cir. 2003), for the proposition that a summary plan document which contains language granting the plan administrator discretion to interpret the plan documents is not effective if it is not part of the policy. Doc. No. 25 at 13-14.

Defendant characterizes the Booklet Attachment as a "summary plan document" and contends that a "careful reading of the [Booklet] as a whole" demonstrates it is part of the ADD Policy. Doc. No. 34 at 17-18. Defendant also contends that the summary plan document is a governing plan document by virtue of 29 U.S.C. § 1024(b)(4), which requires a plan administrator to provide a beneficiary with the latest updated summary, plan description, annual report, terminal report, bargaining agreement, trust agreement, contract or other document under which the plan is established or operated. Doc. No. 34 at 16 n. 4. Because the summary plan document grants it discretion to interpret the terms of the ADD Policy, Defendant contends its

decision denying Plaintiff's claim for benefits should be reviewed under the arbitrary and capricious standard of review.  Doc. No. 34 at 15.[7]

The Booklet, in multiple places, defines the governing documents.  The "Foreword" states: "[t]his Booklet and the Certificate of Coverage made a part of this Booklet together form your Group Insurance Certificate."  Doc. No. 30-5 at 100.  The "Schedule of Benefits" section states:

> This Booklet and the Certificate of Coverage together form your Group Insurance Certificate.  The Coverages in this Booklet are insured under a Group Contract issued by Prudential.  All benefits are subject in every way to the entire Group Contract which includes the Group Insurance Certificate.  It alone forms the agreement under which payment of insurance is made.

Doc. No. 30-5 at 102.  Thus, the Booklet provides that the GIC is made up of the Booklet and Certificate of Coverage, and the group contract is the only agreement that governs payments of benefits.  The "Certificate of Coverage" page reiterates that the "Booklet and this Certificate of Coverage together form your Group Insurance Certificate."  Doc. No. 30-5 at 141.  It also states that "[a]ll Benefits are subject in every way to the entire Group Contract which includes the Group Insurance Certificate."  Doc. No. 30-5 at 141.

The Booklet's provisions clearly state that the Booklet and certificate of coverage form the GIC, which in turn is part of the group contract.  The page appending the Booklet Attachment is equally clear in stating that the Booklet Attachment "is not part of the Group Insurance Certificate" and is only provided and "included in your Booklet-Certificate upon the Employer's request."  Doc. No. 30-5 at 142.  If the Booklet Attachment is not part of the GIC,

---

[7] Defendant further asserts that Plaintiff's argument "is neither supported by the case law inside this Circuit, nor is it internally consistent with the plan documents or the logic and purpose behind the *Firestone* analysis," which requires a denial of benefits be reviewed de novo unless the governing plan documents grant the plan administrator discretion to determine eligibility for benefits or interpret the terms of the plan.  Doc. No. 34 at 16.  Defendant does not cite a single case to support this assertion.

then it is neither part of the Booklet nor part of the group contract.  This conclusion is bolstered by decisions that have confronted very similar language.

In *Roth*, 752 F. Supp. 2d at 1168, the long term disability policy defined the governing plan documents as the group insurance contracts, group insurance certificates and any amendments or endorsements.  Attached to the group insurance certificates were two ERISA statements that granted defendant "'sole discretion to interpret the terms of the Group Contract, to make factual findings, and to determine eligibility for benefits.  The decision of the Claims Administrator shall not be overturned unless arbitrary and capricious.'"  *Id.* at 1167.  The court determined that this language could not confer discretion on defendant because the front covers of the ERISA statements expressly stated that they were not part of the group insurance certificates, the group insurance contracts did not list the ERISA statements as plan documents and the group insurance contracts did not incorporate the ERISA statements through their integration clauses.  *Id.* at 1168.

In *Gingras v. Prudential Insurance Co. of America*, No. 06 C 2195, 2007 WL 1052500 at *5 (N.D. Ill. Apr. 4, 2007), an ERISA statement provided that "'decisions of the Claims Administrator shall not be overturned unless arbitrary and capricious.'"  The ERISA statement also expressly stated that it was not part of the group insurance certificate.  *Id.* at *6.  Based on this statement and the fact that the policy defined the governing plan documents as a group insurance contract and a group insurance certificate, the court determined that the ERISA statement could not confer discretion on defendant because it was not a plan document.  *Id.*

In *Besser v. Prudential Insurance Co. of America*, No. 07-00437 SOM/BMK, 2009 WL 4483796 at *1 (D. Haw. Sept. 30, 2008), the policy defined the governing plan documents as the group contract, group insurance certificate and all amendments and endorsements.  *Id.*   An

ERISA statement, attached to the group insurance certificate, granted defendant sole discretion to interpret, make findings of fact and determine benefit eligibility under the group contract. *Id.* at *2. The ERISA statement also stated that the "'decision of the Claims Administrator shall not be overturned unless arbitrary and capricious.'" *Id.* The court concluded the ERISA statement could not confer discretion on defendant because the page attaching the ERISA statement to the group insurance certificate explicitly stated that the ERISA statement was not part of the group insurance certificate and the insurance policy's integration clause did not incorporate it as a governing plan document. *Id.* at *1-2. *Also see Orantes v. CNH Group Ins. Plan*, No. 10-7215, 2011 WL 1376069 (E.D. Pa. Apr. 12, 2011) (relying on *Besser* to conclude that an ERISA statement was not a plan document where the preceding page stated it was not part of the group insurance certificate and the policy's terms did not incorporate the ERISA statement). Thus, *Roth*, *Gingras* and *Besser* all found that ERISA statements purporting to grant discretion to the defendants were not part of the governing plan documents because such documents expressly excluded the ERISA statements.

Similarly, in *Shaw*, 353 F.3d at 1282, defendant argued that a summary plan description granted it discretion to interpret the policy and, therefore, its decision to deny long term disability benefits should be reviewed under the arbitrary and capricious standard of review. In rejecting this argument, the Eleventh Circuit noted that the policy provided that changes would only be valid if approved by a signed endorsement or amendment, and also contained an integration clause that did not incorporate the summary plan description as a plan document. *Id.* at 1283. The Eleventh Circuit stated that "[i]f the employer and the insurance company wish to include a term as critical as a grant of discretionary authority to the plan administrator, then they can be expected either to write that term into the underlying contract or amend the contract

according to their own, expressly agreed-upon procedures." *Id.* The Eleventh Circuit concluded that "since the clause within the underlying policy states that it is fully integrated, and in the absence of any evidence showing that the plan was properly amended, we are not prepared to validate the grant of discretionary authority contained only within the [summary plan description]." *Id.* at 1284.

The foregoing cases indicate that a statement granting a plan administrator discretion to interpret plan documents, whether contained in an ERISA statement or summary plan document, is not effective if it is not part of the governing plan documents.  There is no language in the Booklet or certificate of coverage incorporating the Booklet Attachment into the Booklet.  In fact, the page appending the Booklet Attachment to the Booklet unequivocally states that the Booklet Attachment is not part of the GIC.  Because the Booklet Attachment is not part of the GIC and there is no evidence that it is part of the group contract, the Court concludes that the Booklet Attachment cannot confer discretion on Defendant to interpret the terms of the ADD Policy because it is not a governing plan document (i.e. group contract or GIC).  Accordingly, Defendant's denial of Plaintiff's claim for benefits under the ADD Policy is subject to de novo review.[8]

### B.  Plaintiff is not Entitled to Benefits Under the ADD Policy

ERISA is silent regarding how disputes about contract interpretation should be resolved. *See Smith v. Home Depot Welfare Benefits Plan*, No. 8:04-CV-1924-T-23TBM, 2006 WL 1980284 at *7 (M.D. Fla. July 12, 2006).  The Court must look to federal common law for

---

[8]   Assuming arguendo that the governing standard of review is arbitrary and capricious, the first step in *Doyle's* multi-step analysis requires the Court conduct a de novo review to determine whether Defendant's decision was wrong.  *See Doyle*, 542 F.3d at 1356.  Thus, the standard of review would not alter the Court's ultimate conclusion, as set forth below, because even under *Doyle*'s multi-step analysis the Court would initially conduct a de novo review.

guidance.  *Id.*  An insurance contract is ambiguous when one reasonable interpretation results in coverage and another reasonable interpretation results in exclusion.  *Billings v. UNUM Life Ins. Co. of Am.*, 459 F.3d 1088, 1094 (11th Cir. 2006) (quoting *Dahl-Eimers v. Mut. of Omaha Life Ins. Co.*, 986 F.2d 1379, 1381 (11th Cir. 1993)).  If an ambiguity exists, it is construed against the drafter.  *See Jones v. Am. Gen. Life & Acc. Ins. Co.*, 370 F.3d 1065, 1070 (11th Cir. 2004). An ambiguity does not exist simply "because a contract requires interpretation or a contract fails to define a term."   *Smith*, No. 8:04-CV-1924-T-23TBM, 2006 WL 1980284 at *7.   In determining whether an ambiguity exists, the "ordinary rules of contract construction require the court first to assess the natural or plain meaning of the policy language, striving to give meaning to every provision."  *Id.*

The ADD Policy states that benefits are payable when an insured sustains an accidental bodily injury that results in "loss due to Quadriplegia, Paraplegia, or Hemiplegia."  Doc. No. 30-5 at 125.   An insured is entitled to benefits for a "loss due to Quadriplegia, Paraplegia, or Hemiplegia," if the insured sustains a "complete and irreversible paralysis" of his upper and lower limbs, upper or lower limbs, or the upper and lower limb on one side of the body.  Doc. No. 30-5 at 125.  The ADD Policy does not define "paralysis."

Plaintiff interprets "paralysis" to mean "<u>impairment or loss of sensation</u> in the limbs." Doc. No. 25 at 19 (emphasis added).   Thus, Plaintiff posits that "complete and irreversible paralysis" can mean "'complete and irreversible impairment of the extremities.'"  Doc. No. 25 at 19.  Plaintiff points out that Defendant interprets "paralysis" to mean the "complete loss of use of a limb."  Doc. No. 25 at 19.  Plaintiff contends that Defendant's focus on the word "complete" in reaching its interpretation is misplaced because "this modifier does not resolve the ambiguity of the word paralysis.  It simply modifies the ambiguous term."  Doc. No. 25 at 19.  Based on these

competing interpretations, Plaintiff contends the ADD Policy is ambiguous because the term "paralysis" is susceptible to two reasonable interpretations, one which results in coverage and another which does not, citing *Rasenack v. AIG Life. Ins. Co.*, 585 F.3d 1311 (10th Cir. 2009). Doc. No. 25 at 19, 22.

In *Rasenack*, 585 F.3d at 1314, the insured obtained an accidental death and dismemberment policy that was administered by AIG Life Insurance, but purchased through his employer.  The accidental death and dismemberment policy contained a provision awarding benefits for an accident resulting in hemiplegia if it occurred within one year from the date of the accident.  *Id.*  Hemiplegia was defined as "'the complete and irreversible paralysis of upper and lower limbs of the same side of the body.'"  *Id.*  The accidental death and dismemberment policy defined "'limb' as the 'entire arm or entire leg,'" but did not define paralysis.  *Id.*  The insured argued that the failure to define paralysis rendered the accidental death and dismemberment policy ambiguous.  *Id.* at 1319.  AIG Life Insurance argued that "hemiplegia carries a plain meaning, *i.e.*, that the entire arm and leg of one side of the body must be 'completely paralyzed.'"  *Id.*  AIG Life Insurance also argued that "complete and irreversible" dispelled any ambiguity in the term paralysis.  *Id.* at 1320.

Referencing Mosby's Medical Dictionary, the court noted that paralysis is defined as "'the loss of muscle function, loss of sensation, or both' and 'complete paralysis' as 'paralysis characterized by a complete loss of motor function.'"  *Id.* at 1319.  The court further noted that other dictionaries define paralysis "in terms of loss of muscle function or sensation not as the absence of all movement," citing Matthew Bender Attorneys' Dictionary of Medicine and Webster's New International Dictionary.  *Id.*  In light of these definitions, the court concluded that "there is more than one reasonable interpretation of the meaning of paralysis, and the Plan is

thus ambiguous for its failure to define the term." *Id.* at 1319-20.  The court also found that "complete and irreversible" simply modified the term paralysis and therefore the definition of hemiplegia still rested on the meaning of paralysis. *Id.* at 1320.  Using the doctrine of *contra proferentem*, the court concluded that "complete and irreversible paralysis" meant "complete and irreversible loss of muscle function or sensation, not the absence of all movement." *Id.*

Defendant does not discuss or attempt to distinguish *Rasenack*.  Instead, Defendant contends the Court must begin its analysis by looking to the "plain and ordinary meaning of the terms as judged by an objective standard of an *ordinary/average person*, not a lawyer or a dictionary writer." Doc. No. 34 at 11 (emphasis in original).  Defendant argues that Plaintiff's assertion that paralysis means impairment relies on "alternative (unnatural, irregular, an unused) obscure dictionary definitions of paralysis, rather than the plain, ordinary layman understanding of the word 'paralysis,' and ignoring the adjectives 'complete and irreversible' that modify the word." Doc. No. 34 at 12.  Defendant concludes that its "determination that the plain, ordinary, layman's understanding of the term 'paralysis' meant 'paralysis' and not 'impairment' was absolutely correct." Doc. No. 34 at 12.

In this case, it is undisputed that the ADD Policy does not define "paralysis."  This, however, does not render the ADD Policy ambiguous.  *See Smith*, No. 8:04-CV-1924-T-23TBM, 2006 WL 1980284 at *7.  The ADD Policy is only ambiguous if the term "paralysis" is subject to two or more reasonable interpretations after considering its natural and plain meaning.  *See Billings*, 459 F.3d at 1094; *Smith*, No. 8:04-CV-1924-T-23TBM, 2006 WL 1980284 at *7.  The Court starts its analysis with the dictionary definitions of paralysis.

Stedman's Medical Dictionary 1295 (26th ed. 1995), defines paralysis as:

> 1. Loss of power of voluntary movement in a muscle through injury to or disease of its nerve supply.  2.  Loss of any function, as sensation, secretion, or mental ability.

Thus, paralysis is defined as the loss of power of voluntary movement in a muscle or a loss of any function, such as sensation.  Dorland's Illustrated Medical Dictionary 1397 (31st ed. 2007), defines paralysis as the "loss or impairment of motor function in a part due to lesion of the neural or muscular mechanism; also by analogy, impairment of sensory function."  Similarly, Webster's Third New International Dictionary 1637 (2002), defines paralysis as the "complete or partial loss of function involving the power of motion or of sensation in any part of the body."

The dictionary definitions indicate that paralysis includes complete or partial loss or impairment of voluntary movement, motor function or sensation.  The ADD Policy, however, modifies "paralysis" with the terms "complete and irreversible."  Doc. No. 30-5 at 125.  Thus, the ADD Policy requires complete, as opposed to partial, and irreversible **loss or impairment** of voluntary movement, motor function or sensation.  Consequently, Plaintiff is correct that "complete and irreversible paralysis" can either mean complete and irreversible loss or complete and irreversible impairment of voluntary movement, motor function or sensation.  This interpretation, however, does not entitle Plaintiff to benefits under the ADD Policy because Dr. Powers' treatment notes do not support a finding that Mr. Charlebois suffered from complete and irreversible paralysis.

Dr. Powers' treatment notes from November 30, 2007, to August 27, 2008, indicate that Mr. Charlebois had a normal gait and was walking in the yard twice per week.  Doc. No. 30-3 at 74, 89.  The September 18, 2008, treatment note indicates that Mr. Charlebois experienced leg pain that was precipitated by exertion, specifically tripping and falling when he went to the

bathroom.  Doc. No. 30-3 at 67.  Dr. Powers' November 14, 2008, treatment note indicates that Mr. Charlebois had refused to walk for the past three weeks.  Doc. No. 30-3 at 63.  It was not until Dr. Powers' December 3, 2008, treatment note that he indicated that Mr. Charlebois could not stand without assistance.  Doc. No. 30-3 at 61.  Subsequently, on March 25, 2009, Dr. Powers indicated that Mr. Charlebois could no longer stand.  Doc. No. 30-3 at 51.

Dr. Powers' treatment notes from August 26, 2007, the date of Mr. Charlebois' motorcycle accident, to August 27, 2008, 367 days later, neither indicate nor suggest that Mr. Charlebois suffered from a complete and irreversible loss or impairment of his legs.  The first suggestion that Mr. Charlebois <u>may</u> have had an impairment with his legs was Dr. Powers' November 14, 2008, treatment note indicating that Mr. Charlebois "refuses to walk."  Doc. No. 30-3 at 63.  It was not until December 3, 2008, that Dr. Powers indicated that Mr. Charlebois could not stand without assistance.  Doc. No. 30-3 at 61.  This was well beyond the ADD Policy's requirement that the paraplegia occur within 365 days of the accident.  Further, Dr. Powers never opined that Mr. Charlebois suffered a complete and irreversible loss or impairment of his legs.  Dr. Powers never found, opined or intimated that Mr. Charlebois suffered from hemiplegia or paraplegia.  Plaintiff has not cited any medical evidence that even suggests Mr. Charlebois suffered a complete and irreversible loss or impairment of his legs.[9]  Consequently, Defendant did not err in denying Plaintiff's claim for paraplegia benefits under the ADD Policy.

Dr. Powers' October 15, 2009, letter also fails to establish that Mr. Charlebois suffered from hemiplegia.  In his letter, Dr. Powers stated that Mr. Charlebois suffered from "partial

---

[9] In her letter appealing the denial of her claim for benefits, Plaintiff argued that she was entitled to benefits because Dr. Fallon indicated that Mr. Charlebois suffered progressive weakness and occasional numbness in his lower extremities.  Doc. No. 30-3 at 2.  Dr. Fallon's observations of progressive weakness and occasional numbness were based on her review of Dr. Powers' treatment notes and, therefore, do not support a finding that Mr. Charlebois suffered from complete and irreversible paralysis in his limbs.

hemiplegia as evidenced by hand muscle wasting and inability to ambulate." Doc. No. 30-4 at 5. By stating that Mr. Charlebois suffered from "partial hemiplegia," Dr. Powers implicitly acknowledged that Mr. Charlebois did not suffer a complete and irreversible loss or impairment of an upper and lower limb on one side of his body. That is required by the plain terms of the ADD Policy. *See* Doc. No. 30-5 at 125. Accordingly, Defendant did not err in denying Plaintiff's claim for hemiplegia benefits under the ADD Policy.

## IV. CONCLUSION

Based on the foregoing, the undersigned **RECOMMENDS**:

1. The Court find that the de novo standard of review governs Defendant's decision to deny Plaintiff's claim for benefits under the ADD Policy;

2. The Court interpret "complete and irreversible paralysis" to mean complete and irreversible loss or impairment of voluntary movement, motor function or sensation;

3. Plaintiff's Motion be **DENIED**;

4. Defendant's Motion be **GRANTED**; and

5. Judgment be entered for Defendant.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**RECOMMENDED** in Orlando, Florida on November 1, 2012.

_____
GREGORY J. KELLY
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Presiding District Judge
Counsel of Record